FILED

IN THE UNTIED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

01 MAY -8 PM 3:03

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| NOLAN BRANTLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO.  99-JEO-1670-W |
| | ) |
| JIM WALTER MINE # 4, | ) |
| | ) **ENTERED** |
| Defendant. | ) |

MAY 8 2001

## MEMORANDUM OPINION

In this action, plaintiff Nolan Brantley ("Brantley" or "the plaintiff"), a former employee of

Jim Walter Mine # 4 ("Jim Walter" or "the defendant"), originally asserted various claims of race

discrimination against the defendant, in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981.  Presently before the court is the defendant's

motion for summary judgment as to all the claims.  A hearing on the motion was conducted on

March 9, 2001.  Upon due consideration, the court finds that the motion for summary judgment

is due to be granted.

## I. BACKGROUND

The plaintiff initially filed his complaint alleging various race discrimination claims,

including disparate treatment, harassment, and unlawful termination.  (Doc. 1).  The defendant

filed a motion for summary judgment on July 28, 2000, and submitted evidentiary material in

support thereof.  (Doc. 14).  The plaintiff filed a memorandum in opposition to the defendant's

motion, and also submitted evidentiary material in support thereof.  (Docs. 20 & 21).  In the

plaintiff's response, Brantley withdrew all his claims against Jim Walter other than his assertion

that he was wrongfully terminated.  (Doc. 21, p. 1).  Accordingly, only that claim is discussed in

detail below.

## II. FACTUAL SUMMARY[1]

The plaintiff is an African-American male who was employed by the defendant for about seventeen years at Mine # 4 and was terminated approximately one year prior to retirement. (Doc. 16, Ex. 1, Nolan Brantley Deposition ("Brantley"), pp. 60, 525 & Defense Exhibits ("DX") 4, 21). Brantley alleges the defendant discriminated against him on the basis of his race by terminating him on February 9, 1999. The defendant contends that Brantley was terminated because he violated an attendance provision in his back to work settlement agreement. (Doc. 15, p. 1).

During the course of his employment, Brantley worked as an inside laborer, a belt cleaner, and longwall helper. (Brantley, pp. 80-81). While at Mine # 4 he was represented by District 20 of the United Mine Workers of America ("the union"). He was subject to a collective bargaining agreement. (Brantley, pp. 83-84). Under the collective bargaining agreement, specific work rules govern the standard of conduct of employees at the mine. The preface to the list of work rules provides, "Any employee who fails to maintain, at all times, proper standards of conduct or who violates any of the following rules will subject themselves to disciplinary action up to and including discharge." (Brantley, DX 5). Furthermore, the collective bargaining agreement outlines specific procedures to be followed in the event of a work rule violation. (*Id.*). Specifically, it provides:

Where management concludes the conduct of employee justifies

---

[1] As this matter is before the court on a motion for summary judgment, the facts are construed in a light most favorable to the plaintiff.

2

discharge, the employee shall be suspended with intent to discharge and shall be given written notice stating the reason with copy to be furnished to Mine Committee. After 24 hours, but within 48 hours, employee shall be afforded the right to meet with the mine superintendent or manager. At such meeting, a member or members of the Mine Committee shall be present and, if requested by the Employee or the Mine Committee, a representative of the District shall also be present.

(Brantley; DX 6, Article XXIV(b)). After an employee has been given a written notice of disciplinary action, a meeting conducted after 24 hours, but within 48 hours ("24/48 hour meeting") is held to determine the actual discipline to be imposed on the employee. (Doc. 16, Ex. 2, Rayford Kelley Deposition ("Kelley 1"), pp. 58-60). In an effort to resolve the situation and save the employee's job, the union may attempt to negotiate a "last chance" agreement with mine management. (Kelley 1, p. 20). Jim Walter Mine # 4 has been utilizing last chance agreements for over twenty years and typically negotiates four or five annually. (Kelley 1, pp. 19-21).

### A.   Pertinent Events Leading Up to Plaintiff's Termination
#### Sleeping on the Job

In September 1998, Brantley was disciplined for allegedly violating Work Rule # 5 – Sleeping on the job. (Brantley, pp. 166-67). Ed Hertzog ("Hertzog"), Brantley's supervisor, claimed that he "observed [Brantley] sitting on a can with his back to the belt with his head laying across a shovel handle sound asleep." (Doc. 16, Ex. 4, Edward Hertzog Deposition ("Hertzog"), pp. 30-31). On a previous occasion, Hertzog allegedly had found Brantley sleeping on the job and had verbally warned Brantley about sleeping. (*Id.*, pp. 34-35). As this was the second "sleeping on the job" incident, Hertzog proceeded to issue a written warning to Brantley consisting of a five-day suspension with intent to discharge. (*Id.* at 35). During the ensuing

3

24/48 hour meeting, mine management agreed to reduce the discipline to a five-day suspension.
(Kelley 1, pp. 42-43). Brantley claims that he was falsely accused of sleeping on the job and
denies having any knowledge of the incident until he was telephoned at home two days later by a
union representative. (Brantley, pp. 125-26, 133-34, 166-68; DX 14 to Pl. Depo.) The record
indicates that there were no other witnesses to the incident. (Hertzog, p. 31).[2]

### B.    Insubordination

On December 19, 1998, Brantley was working the evening shift as a longwall helper.
(Brantley, p. 123). His responsibilities included moving rock, setting timber, pulling shields, and
retrieving parts and tools. (*Id.*, p. 139). Prior to the start of the shift, the longwall began
experiencing electrical problems. (*Id.*, p. 202). In the course of ascertaining the problem,
Hertzog ordered Brantley to retrieve a thumper.[3] (Brantley, p. 208; Hertzog, p. 41). It was
located at the mine's head gate, which was approximately nine hundred and fifty feet away.
(Hertzog, p. 41). Brantley told Hertzog he was in pain and requested some help with the
thumper. (*Id.* at 42; Brantley, pp. 211-13). The following is Brantley's recital of his
conversation with Hertzog:

> When I got back down there, he [Hertzog] told me, he said, Brantley, go back to the
> head gate and go out there to the power center and bring me–bring that thumper
> down here–just like that.

> . . . .

> Then before I left, because I was walking off, but before I left, I said, "Cowboy,

---

[2] The plaintiff has other disciplinary matters in his work history dating back to 1988, but the court does not deem it
necessary to discuss the same for purposes of the present motion. (Brantley, pp. 96-101).

[3] A thumper is an electrical instrument weighing approximately fifty pounds, which is carried by a handle like a
suitcase. (Hertzog, pp. 41-42).

4

I'm probably going to need some help with the thumper." . . . And that's when he shouted out "Go get the thumper, I'm not going to give you no help."

. . . .

And then after that happened, that's when he – that's when I said, "Cowboy, I'm still having a lot of problems with my hip—I'm having a lot of problems with my hip, Cowboy," and that's when he hollered "You're not on restricted duty, go get me the thumper."

And then I said—let me see what I said. I said, "Well, I think I need help, Cowboy." That's when he hollered out "I'm writing you up for insubordination."

I said, "Asking for help?" I said, "If you're going to write me up for insubordination for asking for help, then do what you've got to do then." I walked on off and he said, "I'm taking you out and you're fired.". . .[4]

(Brantley, pp. 211-13). At the end of the conversation, Hertzog went to the head gate and ordered two foremen to escort Brantley to the mine's surface. (Hertzog, pp. 43-44). After the incident, Hertzog wrote Brantley a "Record of Disciplinary Action" pursuant to the collective bargaining agreement. (Hertzog, p. 83). The "write-up" stated that Brantley had violated "Work Rule # 1" and recommended a five-day suspension with intent to discharge.[5]  (Brantley, DX 19).

### 1. Return to Work Agreement

After the "write-up," Rayford Kelley, the Manager of Industrial Relations of Jim Walters, conducted an independent investigation of the incident. (Doc. 16, Ex. 6, Kelley Declaration ("Kelley Declar."), ¶ 5). He obtained statements from Hertzog and other "union co-workers" of the plaintiff who witnessed the events. (*Id*.). He concluded that the plaintiff was insubordinate and needed to be removed from his position. (*Id*.). Accordingly, he made the recommendation

---

[4] No evidence was presented demonstrating that the plaintiff was on any type of restricted duty.

[5] The first work rule (Work Rule # 1) is "[i]nsubordinate conduct." (Brantley, DX 5)

5

of a five-day suspension with the intent to terminate the plaintiff.[6]

As provided by the collective bargaining agreement, Brantley attended a 24/48 hour meeting with union representatives and mine management in order to determine the extent of the discipline to be imposed on him. (Brantley, pp. 230, 234). The company agreed to suspend him for five days and to further consider what additional action, if any, to take. (Brantley, p. 235). Because the union representative, Gary Pickett, recognized that Jim Walters could have fired the plaintiff, he negotiated an agreement intended to save the plaintiff's job. (Doc. 16, Ex. 7 (Gary Pickett Declaration ("Pickett")), ¶ 5). After a series of meetings between union representatives and the mine management, a final draft of a last chance agreement was presented to Brantley. He refused to sign the agreement because he thought it was unfair. (Brantley, pp. 240, 254-58, 499; DX 23).

On January 19, 1999, a return to work settlement agreement was signed by Pickett on Brantley's behalf.[7]  (Brantley, p. 262; DX 19).  Notwithstanding his belief that the terms of the settlement agreement were unfair, Brantley returned to work on the same day the agreement was signed. (Brantley, p. 256). He read the agreement at that time. (*Id.*, p. 262). The terms of the return to work settlement agreement were:

> In full and final settlement of this grievance, management agrees to withdraw the discharge and allow the grievant to return to work immediately provided the following conditions are complied with:

---

[6] The record establishes that "[o]rdinarily, foreman and supervisors do no have the authority to determine or impose discipline on an employee.  Instead their role is simply to report the violation to management." (Kelley Declar., ¶ 3).

[7] The agreement reached between the union and the mine, whereby Brantley was allowed to continue working for the mine has been referred to both as a last chance agreement and a settlement agreement throughout the record.  Kelley, testified in his deposition that the agreement was not a last chance agreement because the plaintiff refused to accept a last chance agreement.  Rather, in a continued effort to save the plaintiff's job, the union agreed to a settlement agreement with the mine.  (Doc. 16, Ex. 3, Second Kelley Deposition ("Kelley 2"), p. 67; Kelley 1, pp. 16-17).

1)      Grievant is to be removed from the Longwall Helper
        classification and is placed in the TSL classification [inside
        laborer], evening shift.

2)      Grievant is to stop questioning every job.  He is also to stop
        talking back and arguing.

3)      For a period of 3 months from the date of this settlement,
        the grievant will be immediately discharged for any non-
        contractual absence. (i.e. regular graduated or floating
        vacation days or sick or personal days).  In addition,
        management agrees to pay grievant 10 straight time shifts,
        three of which are Christmas Eve, Christmas, and New
        Years.

The plaintiff went back to work as an inside laborer instead of a longwall helper.

(Brantley, pp. 263-64, 338).[8]

### 2.  Final Discharge

On February 3, 1999, the plaintiff requested a medical referral to the workers'

compensation physician, Dr. Atkins, for hip and shoulder pain resulting from work related

injuries. (Brantley, pp. 470-73).  The next day, February 4, 1999, the plaintiff was treated by Dr.

Atkins in the morning, but did not report to work for his afternoon shift. (Kelley 1, p. 67).  Either

later that day or the next day when he reported for work (February 5, 1999), the plaintiff

provided Kelley with a physician's release form signed by Dr. Atkins.[9]  The form stated that

Brantley was released to return to work on February 5, 1999.  (Brantley, DX 25).  Upon receipt

of the release form, Kelley telephoned Dr. Atkins' office and spoke with a nurse regarding the

---

[8] At various points in the deposition, the plaintiff states that he does not know whether he went back to work as an
inside laborer or as a longwall helper. (Brantely, pp. 338-39, 347-48).

[9] The plaintiff states that he brought the slip in on Friday, February 5, 1999, and proceeded to work. (Brantley, pp.
478-85).  Kelley states that Brantley brought the form to him on the day Brantley saw the doctor, but did not report for
his shift.  This distinction is not significant since the plaintiff does not dispute that he failed to work his shift on
February 4, 1999, due to a work related injury.  (Brantley, p. 503).

plaintiff's visit. (Kelley 1, pp. 71-72). Kelley states that he called Atkins' office to determine whether Brantley could have worked the afternoon of February 4 since Brantley had a morning doctor's appointment and was not scheduled to work until the evening shift (3:00 p.m. until 1:00 a.m) that day. (Kelley 1, p. 70).

Brantley's return to work agreement mandated that should he miss work for any reason he had to use a contractual day to cover the absence. (Kelley 2, pp. 23-24; DX 19). It is undisputed that Brantley did not request that a contractual day be used to cover his workers' compensation absence on February 4, 1999. The defendant contends that Brantley was required to verbally request the defendant to apply a contractual "sick" day to cover his April 4th absence because it was a workers' compensation absence.[10]

After the plaintiff's return to work, an informal meeting was held between the plaintiff, James Blankenship (the local union president and mine committee member), and Kelley to discuss Brantley's alleged violation of his return to work agreement. (Kelley 1, pp. 80-82; Brantley, pp. 502-03). A formal 24/48 meeting was held to discuss the alleged violation. (Brantley, pp. 517-18). The 24/48 meeting was attended by the plaintiff, Kelley, Kozel (the

---

[10] Under the union agreement with Jim Walters, employees are allowed off days, including contractual days provided under the collective bargaining agreement. (Kelley Declar., ¶ 6). These include graduated and floating days and sick days. (*Id.*). The first two have to be requested in advance and are subject to company approval. (*Id.*). If the number of employees for a particular shift are not sufficient, a request may be denied. (*Id.*). Sick days can be used anytime without permission and therefore are of greater value to the employees. (*Id.*). The defendant acknowledges that "[n]ormally we can take a sick day from employees or up to two sick days on a person when they are out for illness. We just automatically take those days. However, in a workers' comp situation, we cannot take a sick day because we have a couple of arbitration cases where due to the arbitrator's decision, we do not take and cannot take a sick day in a [sic]–we can't automatically take a sick day in a workers' comp situation." (Kelley 2, pp. 80-81).

After counsel for the plaintiff asserted the arbitration cases were "mythical" (doc. 21, p. 7), and after prodding from the court, counsel for the defendant provided counsel for the plaintiff and the court with a copy of the June 2, 1989, arbitration decision *United Mine Workers of America, District 20, Local Union 2245 v. Jim Walter Resources, Inc Mine No. 4*, 4-JWR-88-20-89-7 (June 2, 1989) (Phelan, Arb.) concerning Mine # 4 wherein the arbitrator held that Jim Walter could not unilaterally charge personal or sick leave against an employee for workmans' compensation absences. (Letter dated March 15, 2001).

Mine Manager), Pickett, Blankenship, Mr. Wesley, and two other unnamed individuals. (*Id.*; Kelley 1, p. 90). The defendant asserts that Brantley was told by the union that he could keep his job if he would declare his absence on February 4th a sick day. (Doc. 15, p. 12). The plaintiff asserts that he does not recall this. (Doc. 21, p. 1). According to Kelley, during this meeting, Brantley refused to verbally request management to apply a contractual day to cover the workers' compensation absence. (Kelley 1, pp. 80, 90-91). In contrast, the plaintiff states that no one ever asked him "to take one of my days." (Brantley, p. 590). Subsequently, Brantley was discharged because he refused to "declare a contractual day" for the day he missed. (Kelley 2, p. 41). Kelley recorded the action taken by Jim Walter–"mgt intends to discharge Mr. Brantley as indicated"–on Brantley's disciplinary write-up dated February 8, 1999. (Brantley, DX 28).

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

9

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met her burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. (*Id.*).

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## IV.   DISCUSSION

### A. Generally

The plaintiff asserts that his termination by the defendant was a consequence of discrimination.  In particular, he believes the actions of the defendant leading up to and including his termination were racially motivated. (Doc. 21, p. 6). The plaintiff alleges that there is evidence to support a showing that Hertzog, his former supervisor that was involved in his

placement under the settlement agreement, has a racial bias against African-Americans. (*Id.*). The defendant asserts that the plaintiff's termination claim is insufficient because the plaintiff cannot meet his burden of establishing a *prima facie* case and because he cannot retort the defendant's proffered legitimate, nondiscriminatory reasons for his termination.[11] (Doc. 22, pp. 1-2).

The appropriate framework from which to evaluate the plaintiff's termination claim is the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25, 36 L. Ed. 2d 668 (1973), standard when circumstantial evidence is involved.[12] *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1310-11 (11th Cir.), *superseded in part on other grounds*, 151 F.3d 1321 (11th Cir. 1998). A plaintiff has the initial "burden of establishing a prima facie case of race discrimination." *McDonnell Douglas,* 411 U.S. at 802, 93 S. Ct. at 1824. "If a plaintiff establishes a prima facie case of discrimination, the defendant employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action." *Chambers v. Walt Disney World, Co.*, 132 F. Supp. 2d 1356, 2001 WL 227390 (M.D. Fla.) quoting *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). Once the defendant has articulated its legitimate, nondiscriminatory reasons for the plaintiff's termination, the court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder

---

[11] As noted at the outset, the plaintiff has abandoned all of the claims advanced in the complaint except for the wrongful termination claim.

[12] The plaintiff does not assert that there is direct evidence of discrimination. The only reference in the record to racial animus involved Hertzog. Approximately ten years earlier Hertzog asked an employee, William Kreider, why he testified "for a damn nigger?" (Doc. 16, Ex. 5, p. 24; Brantley, pp. 309-11). Pickett also stated in conclusory fashion that Hertzog does not like blacks. (Brantley, pp. 280-81).

to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1997) (citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)). This must include an evaluation of "whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence.'" *Combs*, 106 F.3d at 1538. If it is "determine[d] that a reasonable jury could conclude that the employer's articulated reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action." *(Id.)*.

## B.    Prima Facie Case

To establish a prima facie case of discriminatory discharge, the plaintiff must prove three elements:

> 1) the plaintiff is a member of a protected class; (2) the plaintiff has engaged--either (a) disputedly or (b) admittedly--in misconduct similar to persons outside the protected class; and (3) that similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment.

*Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d at 1311 n.6.

The plaintiff's assertion that all he is required to show is that (1) he is a member of a protected class; (2) that he did not violate the work rule in question or others who engaged in similar conduct outside the protected class were not disciplined as severely; and, (3) that he was discharged, is no longer correct. (Doc. 21, p. 11, citing *Alexander v. Fulton County*, 207 F.3d

1303, 1334 (11th Cir. 2000) (citing *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989)). As the defendant noted in its reply brief (doc. 22, p. 3), the Eleventh Circuit modified the *Gerwens* decision in the subsequent case of *Jones v. Carraway Med. Ctr.* and held "no plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule. *The plaintiff must also point to someone similarly situated* (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better." *Id.*, 137 F.3d at 1311 n.6. The Eleventh Circuit expressly clarified the specific elements required to establish a Title VII prima facie case. *Id. See also Lathem v. Dept. of Children & Youth Serv.*, 172 F.3d 786, 792 (11th Cir. 1999) (requiring Title VII disparate treatment plaintiffs to show "that the misconduct for which the employer discharged the plaintiff was the same or similar to what a similarly situated employee engaged in, but that the employer did not discipline the other employee similarly"); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (requiring Title VII plaintiff to show that "his employer treated similarly situated employees outside his classification more favorably").

In the instant case, the parties do not dispute that the plaintiff, an African American male, is a member of a protected class. Furthermore, the record shows that the plaintiff disputes that he has engaged in a violation of the defendant's work rules–the violation of the plaintiff's return to work agreement. However, the record is void of any evidence of a comparator to support the third prong enumerated in *Jones v. Bessemer Caraway Medical Center*.

During his deposition, the plaintiff could not recall any similarly situated non-minority employee that had been treated differently than he was treated. (Brantley, pp. 540-52, 592-93). Additionally, the record does not indicate any instances where white employees have not been

discharged when they violated a last chance return to work agreement or similar agreement. (Kelley 1, pp. 23-28). Although it is unusual for any employee to be terminated for violating a last chance agreement, the record shows that another employee Mitchell Bostick, was terminated for violating the attendance control policy in his last chance agreement. (Kelley 1, pp. 23-24).[13]

The plaintiff could not identify any other employees with a last chance agreement who were treated better under their agreement than he was treated. (Brantley, pp. 272-73). Nor could the plaintiff identify any employee (black or white) with a workers' compensation absence that the company had automatically applied a sick day to cover the absence. (Brantley, p. 509). Specifically, when asked if he could identify any white employee that had been treated differently than him under similar circumstances, the plaintiff testified as follows:

Q:   Okay. Can you think of any white employee who has ever been in a situation anything like yours who got treated differently?

A.   They didn't ever put any–no. I can't recall one, no.

Q.   This is important, so let me be sure that I'm asking the question well enough. When you claim race discrimination, are you thinking that there has been a white employee in a similar situation who got treated differently?

A.   Oh, yeah.

Q.   Tell me the names of white employees who you are claiming have been treated differently in similar circumstances.

A.   I can't recall right now, but I will get back with you on that. I'll get back with you on it. I can't recall their names right now.

(Brantley, pp. 540-41).

Q.   What is it that you can't remember? Just their name?

---

[13] Two white employees (Terry Knight and Joe Childers) were terminated after they satisfied their last chance agreement when they later had excessive absenteeism. (Kelley 1, p. 27).

A.   No.

Q.   You can't remember anything about it?

A.   That they did anybody like they did me.

Q.   What?

A.   The way they did anybody like they done me, white or black.  I don't remember they did anybody like this.

(Brantley, p. 545).

Q.   So, when you give me an example of somebody else who was treated that way, you don't know whether there was a worker's comp [sic] claim involved or not. Is that true?

A.   I don't know if that's right.  I don't know.

Q.   Nevertheless, can you give me the name of any person who was treated that way?

A.   No, I don't remember them treating anybody like they treated me that way, no.

Q.   Do you know of anybody who was in the same situation you were in who got punished differently?

A.   No, sir.

Q.   Do you understand what I'm asking you?

A.   Yes, sir.

(Brantley, pp. 592-93).  The record does not demonstrate that the plaintiff ever followed up on this questioning and provided counsel for the defendant with a list of employees who were treated differently.  What is clear, is that the court has not been presented with any such evidence.

Based upon the record before the court, the plaintiff has not established a prima facie case of wrongful termination based upon race.  There is no direct evidence of discrimination by the

15

decision makers that were involved in the plaintiff's termination for allegedly failing to comply with the settlement agreement.[14]  He has not identified any white employee who had a workers' compensation absence which was automatically treated by the company as a sick day.  He has not identified any white person who was treated differently when he failed to comply with the requirements of either a last chance agreement or a settlement agreement.  Accordingly, summary judgment is due to be granted the defendant.

"Because [the plaintiff] failed to present a prima facie case of discrimination, [the] court need not examine [the defendant's] articulated reasons for discharging him, nor determine whether [the] reasons were merely a pretext for discrimination..."  *Hawkins v. Ceco Corp.*, 883 F.2d 977, 985 (11th Cir. 1989).  Nevertheless, assuming the plaintiff had established his prima facie case, the burden would shift to the defendant to provide a legitimate, non-discriminatory reason for the termination and a subsequent analysis of whether the plaintiff could establish pretext would be undertaken.  The court will proceed to examine that aspect as well.

### C.     Legitimate, Non-discriminatory Reason and Pretext

In evaluating whether the plaintiff has demonstrated pretext, the court must examine each of the proffered "legitimate reasons" for the termination and determine whether the plaintiff has cast sufficient doubt on each to permit a reasonable fact finder to conclude that the purported "legitimate reasons were not what actually motivated its conduct."  *Combs*, 106 F.3d at 1538-39.

---

[14] To the extent that the plaintiff asserts that the evidence supports a conclusion that the actions of the defendant were based on race premised on the actions of Hertzog, the court finds this claim to be without merit.  Specifically, the plaintiff asserts that he would not have been on the last chance agreement (settlement agreement) status but for Hertzog's write-up.  (Doc. 21, p. 3 & n.3).  That fact is true, but the write-up was not the reason for his termination.  The plaintiff's alleged violation of the settlement agreement is what resulted in his termination.  The decision to terminate him was made by Kelley and Kozel.  Hertzog was not involved in that decision.  (Hertzog, pp. 85-86).  The plaintiff specifically stated that he never heard Kelley or Kozel make any negative racial remarks.  (Brantley, pp. 296, 381).

16

*See Mora v. University of Miami*, 15 F. Supp. 2d 1324, 1336 (S.D. Fla. 1998) (A plaintiff, nevertheless, can survive summary judgment by presenting evidence demonstrating a genuine issue of material fact as to the truth or falsity of each of the employer's legitimate, nondiscriminatory reasons), *citing Evans v. McClain of Georgia, Inc.*, 131 F.3d 964-65 (11th Cir. 1997)(citing *Combs*, 106 F.3d at 1530-32)). Summary judgment is generally appropriate in discriminatory discharge cases if the plaintiff does not offer sufficient evidence showing that each of the defendant's proffered reasons is pretextual. *Chapman v. AI Transp.*, 229 F.3d 1012, 1024-1025 (11th Cir. 2000) (en banc).

In the instant case, the defendant asserts that the plaintiff was terminated because he violated one of the provisions in his settlement agreement that was negotiated and accepted on his behalf by his union. (Doc. 15, pp. 1, 2, 14). Specifically, the defendant alleges that the plaintiff refused to apply one of his contractual days to cover a workers' compensation related work. (*Id.*). As previously stated, the defendant contends that it was not allowed to automatically apply a contractual day to the absence because of the prior arbitration agreement, which prohibited such actions. The plaintiff's union corroborated the existence of the arbitration agreement and that it did prohibit mine management from automatically applying a contractual day to cover the plaintiff's workers' compensation related absence.[15] (Pickett Declar., ¶ 7). To

---

[15] This is understandable because in *United Mine Workers of America District 20 Local 2245 v. Jim Walter Resources, Inc. Mine Number 4*, Gary Pickett, who was the union representative involved in the plaintiff's situation, was also the union representative involved in that matter. The union alleged in the 1989 arbitration that "the Company's charging of personal or sick leave against Employees injured on the job and receiving Worker's Compensation was a violation of Article IX, Section (e)(5)(a) and Article XXIII, Section (h) of the national Bituminous Coal Wage Agreement of 1988." *United Mine Workers of America District 20 Local 2245 v. Jim Walter Resources, Inc. Mine Number 4* at 2. The grievance filed by the union requested "[m]anagement to cease and desist from taking of sick and personal days for Workman Comp injuries." *Id.* The grievance was settled in favor of the employees. The holding stated that the Jim Walters was not permitted to "make the type of charge to leave. . .that it was attempting to make." *Id.* at 11

rebut the defendant's proffered reason for terminating him, Brantley argues that the defendant's proffered reason for terminating him is pretextual because: (1) the alleged justification is implausible; (2) the defendant deviated from established procedure; and (3) the racial slurs uttered by Hertzog in the workplace. (Doc. 21, p. 15).

### 1. Implausibility

#### a. Absenteeism Provision

In reviewing the defendant's reasons for terminating the plaintiff, the court must keep in mind that the Eleventh Circuit Court of Appeals has stated that "a defendant may terminate an employee for a good or bad reason without violating federal law. . . . We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision. . . ." *Damon*, 196 F.3d at 1361 (citations omitted). The defendant contends that Brantley was terminated for violating the absenteeism provision of his agreement. (Doc. 21; DX 19 to Pl. Depo.). The third provision of his return to work agreement prohibited Brantley from incurring any non-contractual absences for a period of three months. (Brantley, DX 19).

Brantley alleges that inclusion of an absenteeism provision in his agreement was pretextual in that it was intended as a means to terminate him. (Doc. 21, p. 15). Kelley testified in his deposition that it is a common business practice to include an absenteeism provision in last chance (return to work) agreements regardless of the nature of the underlying disciplinary event that led to the agreement.[16] (Kelley 2, pp. 72-74). Nothing in the record evidences that the

---

[16] Specifically, Kelley testified, "They have a percentage of time. Most last chances have one percent or two percent that they can miss depending on the circumstances." (Kelley 2 Depo., p. 72). "A percentage is in most last chance agreements." (*Id.* at 74). Furthermore, in support of its position that it is not unusual to include an absenteeism

inclusion of this provision was intended as a means to ultimately terminate the plaintiff. The

decision to include such a provision, under the facts before the court, is purely a business

decision which allowed the plaintiff to continue working at the mine. The Eleventh Circuit has

made clear:

> Title VII does not take away an employer's right to interpret its rules as it
> chooses, and to make determinations as it sees fit under those rules. Title VII
> addresses discrimination. Title VII is not a shield against harsh treatment in the
> workplace. Nor does the statute require the employer to have good cause for its
> decisions. The employer may fire an employee for a good reason, bad reason, a
> reason based on erroneous facts, or for no reason at all, as long as its action is not
> for a discriminatory reason.

*Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984) (internal

marks and citations omitted). The plaintiff bears the burden to "present concrete evidence in the

form of specific facts which show that the defendant's proffered reason is a mere pretext. Mere

conclusory allegations and assertions will not suffice." *Earley v. Champion Int'l Corp.*, 907 F.2d

1077, 1081 (11th Cir. 1990). The plaintiff has not shown how the incorporation of an

absenteeism provision was implausible. Furthermore, the plaintiff has failed to show by either

direct or circumstantial evidence that the defendant's inclusion of the absenteeism provision in

the plaintiff's return to work agreement was motivated by unlawful racial animus. Brantley's

conclusory, unsupported assertions of implausibility are inadequate to defeat the defendant's

motion. Finally, the complained-about condition is not unreasonable. It allowed the plaintiff to

be absent from work; it simply limited the manner in which he would be permitted absences.

---

provision in last chance agreements, the defendant cites to the fact that the plaintiff's union did not object to the
inclusion of the absenteeism provision in Brantley's return to work agreement. (Doc. 22, p. 12).

19

This is not evidence of pretext.[17]

### b.     Use of Contractual Days to Cover Workers' Compensation Absences

Brantley next alleges that the defendant's reason for terminating him–violation of the absenteeism provision by refusing to verbally request a contractual day to cover a workers' compensation absence–was implausible because the agreement did not specifically state nor was he ever told that he had to verbally request the use of a contractual day to cover a workers' compensation absence. (Doc. 21, pp. 7-8). The plaintiff stated in his deposition that he knew what the terms of the agreement were before he went back to work. (Brantley, pp. 250-54, 261-62). Even though he had received a copy of the full written agreement that he purportedly did not fully understand, he did not make any effort to understand the agreement that the union had negotiated on his behalf. (Brantley, pp. 492, 499). The plaintiff also admitted in his deposition that he had not sought the assistance of the union or the defendant in understanding the terms of the agreement. (Brantley, pp. 498–500).

The parties do not dispute that Brantley was absent from work on February 4, 1999, and that the absence was a workers' compensation absence. Furthermore, it is undisputed that at the time of Brantley's workers' compensation absence he had at least five days of sick leave at his disposal.

---

[17] As recently noted by United States District Judge H. Dean Buttram, Jr., of this court:

> Although termination may, to some, seem a draconian response given the level of Plaintiff's offense, the reasonableness of Defendant's disciplinary policies is not a consideration in determining whether Plaintiff has produced sufficient evidence to prevail on his claims of race and sex discrimination. *See Abel*, 210 F.3d at 1339 n.5. Unfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII. *Coutu v. Martin County Bd. of County Com'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995). As the Eleventh Circuit has stated before, an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984).

*Dent v Federal Mogul Corp.*, 129 F. Supp. 2d 1311, 1315 (N.D. Ala. 2001).

(Brantley, pp. 503-04). The disputed issue centers on whether the defendant could automatically cover the absence with one of Brantley's contractual days and whether it was implausible for the defendant to terminate the plaintiff given the highly disputed issue of whether the plaintiff was told that he had to make a verbal request.

As already stated, the defendant asserts that as a result of several arbitration decisions in the late 1980s, it was prohibited from automatically applying one of Brantley's contractual "sick" days to cover his workers' compensation absence. (Pickett Declar., ¶¶ 8 & 9; Kelley Declar., ¶ 7; Kelley 2, pp. 27-28; Kelley 1, pp. 80-82). Kelley described the policy for covering workers' compensation absences as follows:

> In the past, management could automatically apply a contractual sick day to any employee absence (assuming that employee had not exhausted his/her sick days). Several arbitration decisions in the late 1980s prohibited this practice with respect to workers' compensation absences. Under those decisions, a workers comp employee had to request that a sick contractual day be applied to that absence – management could not make that election on behalf of the employee. Both the union and management are aware of these decisions and the impact they have on workers' compensation absences.

(Kelley Declar., ¶ 7) (emphasis in original). In further support of the existence and adherence to the prior arbitration rulings, Pickett stated:

> As a result of a grievance filed against Mine Number 4 (the mine where Plaintiff was employed), management was prohibited from automatically applying a contractual day (sick day) to cover a workers' compensation absence. Instead, in the context of workers' compensation absence, the *employee* had to elect whether to use a contractual day for this absence. Management simply could not make that determination on behalf of the employee.

(Pickett Declar., ¶ 8) (emphasis in original).

The plaintiff argues that it is implausible for the defendant to terminate him for refusing to comply with a "mythical arbitration ruling." (Doc. 21, p. 7). Nonetheless, the record clearly

indicates that the rule existed.  (Kelley Declar., ¶ 7; Pickett Declar., ¶ 8).  The defendant

contends that Brantley was informed about the arbitration ruling and associated procedure

regarding workers' compensation days before he was terminated.  (Kelley 2 Depo., pp. 78-79).

Furthermore, Pickett stated:

> Consequently, in order for Mr. Brantley's February 4 absence to be
> covered by a contractual day (so he would not violate his settlement and lose his
> job) he had to elect to apply one of his contractual days to that absence.  We (the
> Union) explained this in very specific terms to Mr. Brantley.  Specifically, we told
> him that management could not use a contractual day to cover his workers'
> compensation absence unless Mr. Brantley expressly allowed them to do so.  We
> told him we might get management to apply a contractual day to his absence and
> he can keep his job.  All he had to do was elect to apply a sick day to his absence
> and he would not be in violation of the settlement.  Instead of simply making the
> election, Mr. Brantley insisted that "no one was going to tell him how to use his
> [sick] days" and he would use his days as he wanted and no one could make him
> do anything with his days.  We tried to reason with Mr. Brantley but he insisted
> that no one was going to tell him what to do wit his days because he was off on
> workers' compensation.

(Pickett Declar., ¶ 9).  During his deposition, Brantley, did not offer evidence sufficient to

support his pretext claim.  The colloquy was as follows:

> Q.    Okay.  So did he [Blankenship, union representative] explain to you or tell
>       you that all you had to do to keep your job that day was to declare your
>       absence on the 4th a sick day?
>
> A.    I don't remember did [sic] he tell me that or not.
>
> Q.    You don't deny that, do you?
>
> A.    I don't remember.
>
> Q.    Do you deny that?
>
> A.    I'm not going to deny it.  I don't know.  I don't know whether he told me
>       that or not.  I don't remember.
>
> Q.    So you don't remember it well enough to deny that's what you were told?

22

A.    I don't remember.  That's right, I don't remember.

Q.    Isn't it true that you had the ability on Monday, February 8, 1999, to say that Thursday night, February 4, I'm going to use up a sick day for that and I won't be terminated because that's a contractual absence?

A     I asked Mr. Blankenship why did he give me one of my sick days, and he said because of workmen's comp.  That was before that.  I asked him about that.  That was because of workmen's comp.  And I said how could he fire me then, and he didn't say nothing about it.

Q.    He said what?

A.    I said how come they didn't take one of my sick days away from me, and he said because it was workmen's comp.  And then I said how could y'all [the Union] let them fire me then, and didn't tell me –

Q.    You said how come y'all let them fire me then?

A.    I asked Mr. Blankenship, I said, usually when you're off of work they take one of your sick days automatically.  He said it was workmen's comp.  I said how could y'all let them fire me then if it was workmen's comp.  He said he couldn't take one of my sick days.  I said how could y'all let them do that right there.

Q.    Do you know anything about there being an arbitration decision that said the company can't take a sick day and apply it to a workers' comp absence?

A.    I've never been in arbitration.  I don't know.  I never heard them say that.

Q.    So you don't know anything about that?

A.    No, sir.

Q.    [D]o you acknowledge, that only the employee who has the sick days has the authority to declare a sick day and apply it to a workers' comp absence?

A.    I didn't know that, either.

Q.    Didn't Mr. Blankenship tell you that all you had to do is use one of your sick days and apply it to the Thursday, February 4, shift and you wouldn't

be disciplined?

A.     I don't remember.  Like I said, I don't remember him telling me that.  He might have did, but I don't know.

(Brantley, pp. 504-07).

Q.     On–in this meeting that was attended [24/48 meeting on February 9, 1999] by several more people that you just mentioned, did the subject of taking a personal day or a sick day to excuse that Thursday absence, was that discussed at all?

A.     I don't know.  I really don't know.  The[y] could have, I don't know.

Q.     It could have been?

A.     I don't know.

Q.     Do you remember that you were still determined that no one else was going to tell you how to use one of your sick days?

A.     I don't remember saying that.

Q.     Okay.  But with respect to this second meeting, you don't deny saying that, do you?

A.     I'm not going to deny it.  I might have said it, but I don't remember saying it.

(Brantley, p. 520).

Pickett and Kelley's declarations, which state that the defendant based its termination decision on the plaintiff's violation of an established company procedure, are sufficient to satisfy the defendant's burden of providing a legitimate, non-discriminatory reason for terminating the plaintiff.   The record is void of evidence to dispute the existence and enforceability of the arbitration agreement other than the plaintiff's assertion that he did not know about the arbitration ruling nor the impact it had on the use of contractual days in a worker's compensation

24

context.  Consequently, the plaintiff has failed to provide the court with sufficient evidence to rebut the defendant's proffered legitimate, non-discriminatory reason for terminating him.  The record does not show that the defendant's adherence to a business procedure, whether written or unwritten, was motivated by unlawful racial animus.  Brantley's conclusory, unsupported assertions of implausibility are inadequate to defeat the defendant's motion.  His deposition testimony is not sufficient to overcome the motion for summary judgment.  His testimony does not dispute the issue but demonstrates a lack of recollection of the pertinent events.  That is not sufficient.

### 2.      Deviation from Established Procedure

Brantley further alleges that the defendant's proffered reason for terminating him is pretextual because the defendant deviated from normal procedure by telephoning the workers' compensation physician, Dr. Atkins, after the defendant received a doctor's excuse from Brantley.  (Doc. 21, p. 6).  It is undisputed that Kelley did telephone Dr. Atkins' office after he received the doctor's excuse from Brantley.  (Kelley 2, pp. 67-70).  The defendant's articulated reason for terminating Brantley was that he violated the terms of his back to work agreement. (Doc. 22, pp. 1, 2).  The defendant does not contend that Brantley's termination was based in any way on the call to the physician's office; nor is there evidence in the record (other than the plaintiff's unsupported allegation) to suggest that this was a factor in the termination decision. (Doc. 22, p. 15).  Kelley's deposition testimony regarding the telephone call was as follows:

> Q.      My question is, when you received the letter or the doctor's excuse from Mr. Brantley, did you follow the same procedure that you would have followed with any other employee by calling his doctor's office?
>
> A.      I would not normally call a doctor's office on every doctor's excuse.  In fact, Mr.

> Brantley was on a negotiated put him back to work agreement.  I called to determine whether he could have work[ed] that afternoon on the 4th or not.  I got Mr. Brantley in –

(Kelley 2 Depo., pp. 70-71).  The plaintiff asserts "if a procedure is followed for the first time with a minority employee then discrimination may be inferred."  *Batey v. Stone*, 24 F.3d 1330, 1334 (11th Cir. 1994).  However, the plaintiff has failed to show a causal link between the first time procedure and the termination of the plaintiff.  The plaintiff has not shown that the practice went against established company policy, that it was motivated by racial animus, or that a white employee was treated differently.  Additionally, this simply constitutes a reasonable means whereby Kelley could determine whether the plaintiff could have worked on the fourth.  Under these circumstances, the plaintiff's allegation does adequately challenge the defendant's reason for terminating him to submit this matter to a jury.

### 3.    Racial Slurs Uttered by the Supervisor in the Workplace

Brantley asserts that his termination was racially motivated because Hertzog has an alleged racial bias against African-Americans.  (Doc. 21, p. 6).  The court has previously found that Hertzog was not involved in the development of Brantley's return to work agreement[18] nor was he a decision-maker involved in the final termination of the plaintiff.  (Hertzog, pp. 53-52, 85-86).  Furthermore, there is no indication that Hertzog's alleged racial animus in any way affected the actual decision-makers' determination to terminate Brantley.  The decision makers who were involved in the termination decision were Kelley and Kozel.  (Kelley Declar., ¶ 3).  The plaintiff candidly admits that he has never heard either Kelley or Kozel make any racially

---

[18] He was merely the person who wrote up the incident that precipitated the settlement agreement.

derogatory remarks. (Brantley, pp. 296-97, 381). When placed in context, the alleged racial bias of Hertzog is insufficient to warrant denial of the motion for summary judgment.

## V.     CONCLUSION

In summary, the plaintiff has not presented evidence sufficient to support the required prima facie case. His allegations and observations do not present the type of evidence necessary to retort the articulated, legitimate, non-discriminatory reasons for the plaintiff's termination offered by the defendant and supported by the record before the court. As stated above, the court has considered Brantley's observations in its evaluation, but finds them lacking in force and effect to prevent the granting of the defendant's motion for summary judgment. For the foregoing reasons, the undersigned magistrate judge finds that the "Defendant's Motion for Summary Judgment" (doc. 14) is due to be granted.

**DONE,** this the ___8th___ day of May, 2001.

_____
**JOHN E. OTT**
United States Magistrate Judge

27